UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| SHAYNE WEAVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:17-cv-00118-JMS-MJD |
| | ) | |
| MICHAEL P. MORRIS, *Sheriff of Knox County, Indiana*, and QUALITY CORRECTIONAL CARE, LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff Shayne Weaver slipped on a wet floor and twisted his knee while he was incarcerated at the Knox County, Indiana jail (the "Jail") in March 2016. Mr. Weaver reported his injury, and subsequently received medical treatment and an x-ray, but did not receive an MRI until August 2016. The MRI revealed that Mr. Weaver had torn his ACL, and he had surgery in November 2016 after he was released from the Jail. The surgeon advised Mr. Weaver that his initial ACL tear could not be repaired, and that the stability of his knee may be affected and he may develop arthritis in his knee in ten to fifteen years. Mr. Weaver initiated this lawsuit in March 2017, and asserts claims against Defendants Knox County Sheriff Michael Morris and Quality Correctional Care, LLC ("QCC") for violation of his Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate indifference to his medical needs, against Sheriff Morris and QCC for violation of 42 U.S.C. § 1983 by denying him his right to due process of law under the Fourteenth Amendment, and against QCC for negligence. Both QCC and Sheriff Morris have moved for summary judgment on all of Mr. Weaver's claims, [Filing No. 67; Filing No. 70], and those motions are now ripe for the Court's decision.

# I.

## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d

892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed above.[1] The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Medical Services at the Jail

Through the Knox County Inmate Healthcare Service Agreement (the "Agreement"), the Knox County Sheriff's Department contracted for QCC to provide inmate medical care services

---

[1] For ease of reading, the Court quotes verbatim from the evidence presented by the parties and has not, for the most part, corrected typographical errors.

at the Jail.  [Filing No. 71-1.]  Among other things, the Agreement states that QCC will provide on-site physician/medical director coverage, to include one physician visit per week and a physician available via telephone or email twenty-four hours per day, seven days per week.  [Filing No. 71-1 at 1.]  The Agreement also requires QCC to provide on-site nursing (LPN or RN) coverage for forty hours per week to perform services that include "sick call, medical, dental screenings and medication pass (while on site) as required by law."  [Filing No. 71-1 at 2.]

The Agreement addresses situations which require off-site care, stating:

When off-site care, including hospital care, ambulance services are required for a covered person – in the opinion of the treating physician and/or QCC's Medical Director, QCC shall arrange for said care and be financially responsible for the cost of all approved medical care and/or diagnostic testing, up to the maximum dollars pool agreed ($100,000 annually).  QCC shall arrange all off-site treatment and care in accordance with accepted Policies and Procedures.  All off-site care shall be performed by certified medical professionals.

[Filing No. 71-1 at 2-3 (emphasis omitted).]  The Agreement requires QCC to "manage all inmate healthcare costs for off-site services up to an annual pool limit of $100,000.  If medical, services exceed the total of the annual pool, all excess invoices shall be returned to the COUNTY for payment."  [Filing No. 71-1 at 7 (emphasis omitted).]  The Agreement provides that "[o]ff-site service expenses for [Department of Corrections ("DOC")] inmates shall not be charged against the Medical Services Pool and shall be billed directly to the DOC whenever possible."[2]  [Filing No. 71-1 at 8.]

---

[2] During his incarceration at the Jail, it appears that there was a dispute regarding whether Mr. Weaver was considered a DOC inmate.  Mr. Weaver believed that he was a DOC inmate, and at least one QCC employee did not think that was the case.  [See Filing No. 72-1 at 21-22 (Mr. Weaver stating in a request for medical services "the new nurse keeps arguing with me that Im not doc, and I have paper work saying I am.  Im done arguing with medical cause they will not give me the medical treatment I need as an inmate (doc or county)…".]  The Court assumes for purposes of the Motions for Summary Judgment that Mr. Weaver was a DOC inmate.  Additionally, although none of the parties present evidence to support the fact, the Court assumes that Mr. Weaver was considered an out-of-county inmate.

**B. Mr. Weaver's Injury and Medical Treatment**

Mr. Weaver was an inmate at the Jail in March 2016. [Filing No. 69-1 at 1; Filing No. 69-1 at 6; Filing No. 69-2 at 9.] At the end of that month, the heating and cooling system in Mr. Weaver's block at the Jail was not working, and condensation had built up on the walls and floors. [Filing No. 71-2 at 3.] Mr. Weaver was wearing plastic sandals and slipped as he was walking into the bathroom. [Filing No. 71-2 at 3.] He "tweaked" his left knee and "twisted it good." [Filing No. 71-2 at 3.] Timothy Page, another inmate, helped Mr. Weaver back to his bunk. [Filing No. 71-2 at 3.]

When Mr. Weaver got back to his bunk, a guard told him he would need to wait until the nurse came in. [Filing No. 71-2 at 3.] The next day, he went to sick call where the nurse examined his knee and "said it was bad, that he'd get ahold of the doctor, they [were] going to have to do x-rays." [Filing No. 71-2 at 4.] The nurse also told him that first he should rest his knee for two weeks and keep his foot up. [Filing No. 71-2 at 4.] He was not given ice, but made his own ice packs. [Filing No. 71-2 at 4.]

On April 19, 2016, Mr. Weaver requested medical services and stated "I slipped on some water a week ago on the floor banging my knee, I thought it was just bruised but after a week it has gotten worse. I afraid I have tore something not sure, it gets worse when I'm laying down then get back up, lots of pain, need someone to check it out." [Filing No. 72-1 at 9.] Mr. Weaver was seen by medical staff that same day, and the nurse that examined him wrote "inner side of knee pain from slip & fall 7 days ago." [Filing No. 72-1 at 10.] The nurse noted that Mr. Weaver had increased pain with staying still and decreased pain with mobility, and that Mr. Weaver had no past trauma, no surgeries, and had reported that it had gotten worse and he was walking with a limp. [Filing No. 72-1 at 10.] An x-ray was performed on Mr. Weaver's left knee later that day,

and the Radiology Report from the x-ray stated "[t]he knee joint is intact. No fracture or dislocation is seen. No suprapatellar joint effusion is seen…. No acute fracture or dislocation in left knee." [Filing No. 72-1 at 11.]

On April 25, 2016, Mr. Weaver again requested medical services and stated "my knee is still hurting bad, they took x-rays of it but I still havnt heard anything back?" [Filing No. 72-1 at 12.] Staff responded "X-ray was Negative. Rest the knee and keep it elevated. Ibu or Tylenol is available on commissary." [Filing No. 72-1 at 12.] Mr. Weaver again requested medical services on April 26, 2016, stating "you say x-ray was negative, my knee in bad shape can we get a mri?" [Filing No. 72-1 at 13.] Staff responded "I will ask the provider." [Filing No. 72-1 at 13.] Mr. Weaver did not hear anything further regarding his April 26, 2016 request. [Filing No. 72-1 at 3.] Dr. Quentin Emerson, a QCC employee working as a physician supervising and delivering care to inmates and pre-trial detainees at the Jail, instructed a nurse to inform Mr. Weaver that he should rest, ice, and elevate his knee, and take Ibuprofen. [Filing No. 69-6 at 2.] Dr. Emerson reasoned that soft tissue knee injuries can take several months to fully heal, and that Mr. Weaver's knee appeared to be healing as demonstrated by his normal range of motion and his ability to ambulate unassisted. [Filing No. 69-6 at 2.]

On June 8, 2016, Mr. Weaver requested medical services and stated "Its been 3 months now and my knee is still not better. I'm telling you something is tore. I need MRI bad. Please let me know something. So I can figure out what steps to take next." [Filing No. 72-1 at 14.] Staff responded "Will put you on to see the DR. he has to order further testing." [Filing No. 72-1 at 14.] Mr. Weaver did not receive any further response, [Filing No. 72-1 at 3], and so he filed another request for medical services on June 15, 2016 stating "i slipped on water in a-pod almost 3 months ago twisting my knee. i have put several request in saying I believe something is torn in

my knee. you all did x-rays and said nothing is wrong, well I need a mri. i feel like im being denied medical treatment. actions will be taken if still being denied." [Filing No. 72-1 at 15.] Staff responded "[t]he x-ray was negative and we have to have an order for MRI from the doctor. Will let doctor see your chart and records on his next round." [Filing No. 72-1 at 16.] On June 20, 2016, medical staff stated "Per doctors orders starting you on Ibuprofen for ten days tonight." [Filing No. 72-1 at 16.]

Mr. Weaver did not see medical staff for the rest of June, [Filing No. 72-1 at 3], and filed another request for medical treatment on July 5, 2016 in which he stated "my knee is still not better, still in lots of pain, Ibuprofen has ran out, pain is worse since then. Im telling something is torn I know it." [Filing No. 72-1 at 17.] Staff responded "[w]ill talk with the doctor." [Filing No. 72-1 at 17.] On July 10, 2016, Mr. Weaver submitted another request for medical services in which he stated "[m]y knee is still not getting better. I'm really upset that I'm not getting the medical treatment I need. My mom is a RN and says I need a MRI. I'm in serious pain still. I'm keeping everything record. And getting lawyer if not tooken care of." [Filing No. 72-1 at 18.] Staff noted "I will talk with the doctor about an MRI," then noted a few days later "Per doctors orders we are not going to obtain an MRI d/t they just received an xray on your knee in April of 2016 and everything came back just fine. Starting you on some Ibuprofen for the pain. Also keep it elevated throughout the day and do not do any strenuous activity on it." [Filing No. 72-1 at 18.]

On July 20, 2016, a QCC nurse told Mr. Weaver that he "needed an MRI and that he would check on it for me but said he found out the jail insurance wouldn't cover it." [Filing No. 72-1 at 4.] Mr. Weaver filed several requests for medical services on July 20, stating:

- "I hurt my knee at the end of march in a-pod when a/c unit was down it was humid in here causing floors to be real wet. I slipped twisting my knee. there was swelling and bru[i]sing. They did x-ray but no breaks. Nurse stan told me needed mri and that he check on it. but found out insurance wont cover";

- "[S]omething is torn in my knee for sure. I have been putting in request for months about my knee and the pain Im in. they keep telling me to keep elevated and Ibuprofen for so many days, that they are not going to do anything else…"; and

- "[B]ut the new nurse here keeps arguing with me that Im not doc, and I have paper work saying I am. Im done arguing with medical cause they will not give me the medical treatment I need as an inmate (doc or county) I get out aug. 28th 2016 and Im purs[u]ing legal matters over my knee. just wanted record."

[Filing No. 72-1 at 20-22.]

QCC notes from July 21, 2016 indicate that Mr. Weaver had finished Ibuprofen and believed something was torn in his knee, that he was "limping in pain," and that he was requesting an MRI, but that Dr. Emerson would not order an MRI because the x-ray "came back normal in April 2016." [Filing No. 72-1 at 19.] Mr. Weaver also saw the Jail Commander when he was passing out mail one day around this timeframe, and the Jail Commander said that there are funds allotted for MRIs, that he should not have been denied an MRI, and that the Jail Commander would "take care of this."

[Filing No. 71-2 at 13.]

On August 8, 2016, Mr. Weaver met with Dr. Terry Fenwick, an outside medical provider, who noted:

Shane presents as a new patient for his LEFT knee pain. He states that in March this year, he was walking on a concrete floor when he slipped on a wet spot and twisted his left knee. He felt pain immediately. He did fall on both knees. He denies any swelling at the time or presently. His pain is located on the medial side of the knee. He did not seek any medical attention until about 2 weeks later. He had X-rays done by Mobilex and were read as negative. He does not have the disc with him today. He says the knee did feel like it would give out on him for the first few months. He says it does not feel like that now. He does have pain in the middle of the night. He describes the pain as a stabbing pain. He has been taking ibuprofen 600mg bid. He was icing the knee when the injury first happened, but he feels like the ice made it feel tighter. He has good ROM of the knee. He is FWB with no walking aids.

[Filing No. 69-5 at 1.] Mr. Weaver was scheduled to have an MRI. [*See* Filing No. 69-5 at 2.]

Mr. Weaver met with Dr. Fenwick on August 15, 2016, and they reviewed the results of an MRI that had taken place on August 12, 2016:

> The report gives the impression of a partial tear of the ACL. Explained that he also has a probable torn medial meniscus which is correlated with pt's pain. Discussed doing surgery to clean up the meniscus and possibly fix any other torn pathology, if indicated. Explained that it may be a struggle to have it covered by insurance due to the fact that the impression on the MRI did not reveal a torn meniscus, although there is a chance there could be some torn cartilage not seen on the MRI that is seen during the procedure. Patient is getting out of jail on August 28th and plans to have his surgery covered by jail insurance since the injury occurred while in jail…. Patient agreed to have the surgery due to the amount of pain he is in; he is ready to have it fixed having lived with the pain for 4 months now.

[Filing No. 71-5 at 4.]

On or around August 22, 2016, Mr. Weaver tweaked or twisted his knee getting out of bed.

[Filing No. 69-1 at 6.] He was given Ibuprofen and different shoes to wear on August 23, 2016.

[Filing No. 69-1 at 6; Filing No. 69-2 at 1.] On August 25, 2016, Mr. Weaver filed a request for medical services in which he stated "after several attempts to see a doctor over my knee since march when [I] slipped and twisted my knee, I finally get to see one this month. he sends me to a orthopedic doctor dr. finwick, he sent me for a mri and it came back I have a partial torn acl and medisis he says I need surgery, they schedual me for surgery the 16th of sept. 2016 to repair and clean my knee up, now nurse is saying still waiting on jail insurance to call back and let her know if covering or not. in last few days i have retwisted my knee causing more damage on the other side of knee, appointment to go see dr. finwick set up for friday 08/26/2016 for retwisting it. heres the deal. [I] get out this Sunday 08/28/2016 at 8 a.m. and I hurt my knee back in march in knox county jail custody. over 4 months I was denied seeing a doctor and the proper medical care I need. now im being told insurance may not cover it and its pushing 2 weeks since last doctor visit. if this is not resolved soon, u leave me no choice but to hire a lawyer and sue, alon[g] with

contacting the ACLU and ICLU and local news stations.  i will not stand by and let this go overlooked.  my family and i are very upset about this." [Filing No. 72-1 at 25-28.]

Staff responded "THIS INFORMATION IS BEING PASSED TO THE MEDICAL STAFF.  AS OFFICERS HAVE NO SAY IN MEDICAL TREATMENT FOR inmateS." [Filing No. 71-4 at 19.]  Mr. Weaver was seen by medical staff on August 26, 2016, where his knee appeared slightly swollen and was wrapped with an ACE bandage, and he was instructed to unwrap his knee at night to allow the swelling to go down.  [Filing No. 69-2 at 2; Filing No. 69-5 at 3 ("Patient here today due to increased pain of the left knee after having a re-injury of his knee 3 days ago when he rose from bed and the knee gave way and he twisted the knee.  Discussed it is possible he could have a lateral meniscus tear as well.  He has an ace wrap around the knee that he rewraps several times per day.  The knee and leg is swollen.  Encouraged him to remove the wrap for night time to help decrease the edema below the wrap.  Discussed with him that we could do a cortisone injection but he declines at this time.  We can increase his Ibuprofen to 800mg bid – they only get meds bid.  Encouraged to maintain his ROM.  Avoid kneeling/squatting as much as possible.  Ice to knee several times/day if possible (he is unsure if he can ice in the jail).  Elevate the knee prn.  Discussed with him that we would talk to Dr. Fenwick to make sure that he did not want a repeat MRI due to re-injuring the knee if he proceeds with surgery").]

Mr. Weaver was released from the Jail on August 28, 2016, and got surgery on his own from Dr. Fenwick to repair his torn ACL and meniscus on November 4, 2016, after he had qualified to receive Medicaid.  [Filing No. 72-1 at 6.]  During the surgery, Dr. Fenwick found that Mr. Weaver's ACL "was partially there but it was not attached and it was avascular." [Filing No. 72-1 at 6; Filing No. 72-1 at 29 (medical records from surgery stated "The ACL was partially there but it was not attached and it was avascular.  [The] compartment revealed intact medial meniscus

and intact medial articular surfaces.  It should be noted all the surfaces and menisci were carefully probed.  The medial gutter revealed a medial plica band.  Motorized Shavers used to resect the medial plica band.  A 2nd inspection of the knee was carried out and no additional pathologies were noted.  The excess fluid was removed…").]

Mr. Weaver recovered quickly from the surgery, which ultimately entailed cleaning up the meniscus but did not include ACL repair.  [Filing No. 71-2 at 28.]  Dr. Fenwick informed Mr. Weaver that the ACL tear was "a permanent injury that would cause [him] arthritis in the next 10 to 15 years and [he] would probably have problems down the road with it.  But there wasn't much [he could] do for the ACL at this time, because it was totally gone, unless he put a cadaver bone in it."  [Filing No. 71-2 at 28-29.]  Dr. Fenwick also told Mr. Weaver that he has some options in terms of repairing his ACL.  [Filing No. 71-2 at 43.]  Mr. Weaver is still evaluating his options regarding further treatment for his knee.  [Filing No. 71-2 at 30-31.]

Dr. Fenwick did not give Mr. Weaver his opinion regarding whether a delay in getting an MRI impacted his knee injury, or whether his torn ACL was caused by his initial slip and fall in March of 2016.  [Filing No. 71-2 at 27; Filing No. 71-2 at 44-45.]  Mr. Weaver does not remember any medical professional ever telling him that a delay in getting an MRI caused a delay in getting surgery.  [Filing No. 71-2 at 46-47.]

### C.  The Lawsuit

Mr. Weaver initiated this litigation on March 15, 2017, [Filing No. 1], and filed the operative Amended Complaint on January 25, 2018, [Filing No. 43].  He alleges claims for: (1) violation of the Eighth Amendment to the United States Constitution against QCC and Sheriff Morris; (2) violation of 42 U.S.C. § 1983 against QCC and Sheriff Morris; and (3) state law

negligence against QCC.[3] [Filing No. 43 at 2-5.]  Mr. Weaver does not assert any claims against any of the individuals who provided medical treatment to him.  Defendants have moved for summary judgment on all of Mr. Weaver's claims.

## III.
### DISCUSSION

**A.  Eighth Amendment and § 1983 Claims**

In support of their Motions for Summary Judgment on Mr. Weaver's Eighth Amendment and § 1983 claims, QCC and Sheriff Morris make two main arguments:  (1) that Mr. Weaver has not produced any evidence that the alleged violation of his constitutional rights was a result of the policies or practices of QCC or the Jail; and (2) that they were not deliberately indifferent to any serious medical need of Mr. Weaver.  [Filing No. 68 at 5-9; Filing No. 71 at 8-15.]  The Court addresses each argument in turn.

*1.  Policy or Practice*

QCC argues in support of its Motion for Summary Judgment that Mr. Weaver must show that the alleged constitutional violations were the result of a policy or practice of QCC, and that he has not alleged any such policy or practice and has "produced no facts supporting a claim that an official [QCC] policy or custom was the 'moving force' behind the alleged constitutional violation." [Filing No. 68 at 8-9.]  Sheriff Morris argues that he is only sued in his official capacity as Sheriff of the Jail, that such a claim is construed as a claim against the Jail, and that Mr. Weaver has not produced any evidence that "any purported custom or policy was a moving force behind the denial/delay of adequate medical care." [Filing No. 71 at 9-10.]  Sheriff Morris notes that Mr.

---

[3] Mr. Weaver initially asserted his negligence claim against Sheriff Morris as well, but the Court subsequently dismissed that claim as against Sheriff Morris after Sheriff Morris moved to dismiss it and Mr. Weaver agreed that dismissal was appropriate.  [Filing No. 53; Filing No. 59; Filing No. 62.]

Weaver "specifically testified that he did not know of any other inmates who had experienced a similar delay in receiving an MRI while in custody nor that he was aware of any other inmates who went through a similar experience at the [Jail]." [Filing No. 71 at 11.] He contends that Mr. Weaver's "inability to allege anything other than a one-time occurrence forecloses any possibility of holding the Knox County Sheriff's Department liable under *Monell* for the alleged delay in being given an MRI for his left knee." [Filing No. 71 at 12.] Finally, Sheriff Morris argues that his policymaking authority did not extend to the medical needs of inmates, and that there is no evidence that Sheriff Morris participated in the denial/delay of adequate medical care to Mr. Weaver. [Filing No. 71 at 13.]

Mr. Weaver responds within his discussion of deliberate indifference, arguing that "[b]y the evidence submitted in support of Weaver's Affidavit, the [Jail] and QCC had a policy of ignoring requests for outside medical services and delaying or refusing treatment. They also had a policy of treating in-County inmates more rapidly than out-of-County inmates…. In addition, the affidavit of Shayne Weaver indicates that the Sheriff had a policy which allowed in-county inmates to get treatment and medications more promptly than out-of-Knox County inmates." [Filing No. 72-2 at 4.]

In its reply, QCC argues that Mr. Weaver's assertions in paragraphs 23 and 25 of his Declaration are the only evidence he has offered to show that the alleged constitutional violations were a result of a policy or practice of QCC, and that those assertions are inadmissible and/or do not indicate the existence of a policy or practice. [Filing No. 76 at 4-5.] QCC asserts that it did not have a policy or practice of delaying or refusing to provide outside medical services to inmates at the Jail or refusing to expend money from a shared pool to conserve funds, pointing to the fact that the hospital, and not the Jail, scheduled Mr. Weaver's surgery for after his release, and that

there is no evidence that the availability of insurance for the Jail played any role in when Mr. Weaver's surgery would take place.  [Filing No. 76 at 6-7.]  QCC also distinguishes a case heavily relied upon by Mr. Weaver, and notes that "Mr. Weaver received care from employees of [QCC] who had no policymaking authority."  [Filing No. 76 at 9.]  QCC argues that Mr. Weaver has only presented evidence of one other inmate who potentially should have been referred for outside care and was not, and states that Mr. Weaver's argument that another inmate broke his hand and received surgery the same week "contradicts his earlier claim that [QCC] maintains a policy of denying or delaying referrals to outside medical providers."  [Filing No. 76 at 10.]  Finally, QCC argues that it does not have a policy of treating in-county inmates more rapidly than out-of-county inmates, and that Mr. Weaver only argues that the Jail had such a policy.  [Filing No. 76 at 11-12.]

In his reply, Sheriff Morris addresses and distinguishes the case that Mr. Weaver relies upon in his response brief.  [Filing No. 75 at 4-5.]  He contends that Mr. Weaver's argument that Sheriff Morris somehow created a de facto policy by passing medical requests to medical personnel is unavailing because Mr. Weaver did not have any contact with Sheriff Morris, submitted his requests directly to medical personnel through an electronic system, and always received responses to his requests.  [Filing No. 75 at 5.]  Sheriff Morris reiterates his arguments regarding Mr. Weaver's lack of evidence of a policy at the Jail.  [Filing No. 75 at 7-11.]

a.  Applicable Law

QCC has contracted with the Jail to provide medical care to its inmates, and is "treated the same as a municipality for liability purposes under § 1983."  *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"); *see also Hahn v. Walsh*, 762 F.3d 617, 639-40 (7th Cir. 2014); *Valdez v. Corizon, Inc.*, 2014 WL 1874875, *6 (7th

Cir. 2014) (finding prisoner could only assert § 1983 claim against Corizon for health care received at Indiana State Prison if "poor healthcare leading to the injury [was] the result of the employer entity's policy or practice"); *Heard v. Illinois Dept. of Corrections*, 2012 WL 832566, *7 (N.D. Ill. 2012).   Additionally, Mr. Weaver's claims against Sheriff Morris are construed as claims against the municipality (here, the Jail) itself.   *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 382 (7th Cir. 1988) (a claim against trustees sued in their official capacity operates as a claim against the municipality itself).

Defendants may be held liable for harm to persons incarcerated "if [they] maintain[ ] a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners."   *Minix*, 597 F.3d at 832 (citation and quotation marks omitted).   The "policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional."   *Id.* (citation omitted).   "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through 'a series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees."   *Id.* (citation omitted).

"It is well-established that there is no respondeat superior liability under § 1983." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002).   A "private corporation [or a municipality] is not vicariously liable under § 1983 for its employees' deprivation of others' civil rights."   *Id.*   "In general terms, to maintain a viable § 1983 action against a municipality or similar entity, a plaintiff must demonstrate that a constitutional deprivation occurred as the result of an express policy or custom of the [entity]."   *Id.* (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)).

The Court notes at the outset that Mr. Weaver does not allege in his Amended Complaint that a policy or practice of QCC or the Jail led to the alleged constitutional violations. [*See* Filing No. 43.] Nor does he mention any policies or practices in his Statement of Claims. [*See* Filing No. 50.] Because Mr. Weaver cannot amend his complaint through his response brief, *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011), this failure to allege a policy or practice alone is enough to warrant summary judgment in favor of Defendants. *See Ford v. Sessoms*, 727 Fed. App'x 875, 877 (7th Cir. 2018) ("Regarding the City and the defendants named in their official capacities, [plaintiff's] conclusory complaint did not plausibly allege an actual or de facto policy of indifference to racial harassment, and therefore he did not state a claim under *Monell*…."). Out of an abundance of caution, however, the Court will address the policy or practice arguments Mr. Weaver raises in his response to Defendants' Motions for Summary Judgment.

### b. Policy or Practice of QCC

In his response to Defendants' Motions for Summary Judgment, Mr. Weaver describes the following policies or practices on the part of QCC:

- Delaying Mr. Weaver's MRI and surgery "on purpose to avoid the use of the $100,000 pooled funds"; and

- Ignoring requests for outside medical services and delaying or refusing treatment.

[Filing No. 72-2 at 3.]

QCC has objected to two paragraphs of Mr. Weaver's Declaration, upon which Mr. Weaver relies for his policy or practice arguments, arguing that they constitute inadmissible hearsay. In those paragraphs, Mr. Weaver states:

23. Other inmates at Kx County Jail were also refused or delayed in receiving treatment. Inmate Timothy Page had an ear infection with green pus coming out of

his ear and the medical and jail staff wouldn't refer him to a doctor. Like wise, Kenny Keller fell and broke his collar bone and it took two weeks for him to see a doctor.

25. In July the Jail Commander told me that he would see that he got me an MRI and that the Jail had money set aside for these kinds of expenses and that he felt bad because in-county inmates were receiving more prompt treatment and medications than out-of-county inmates like me. He told me that one in-county inmate broke his hand and they took him to surgery the same week. He also said that Clint Morgan, a Knox County inmate got prescriptions he needed but that since I was an out-of-county inmate they didn't know I was being treated differently. He told me that he would personally see the doctor and get me an MRI in July. However, I didn't get it until August.

[Filing No. 72-1 at 6-7.] The Court considers those paragraphs and concludes that, in any event, they do not aid Mr. Weaver in establishing a policy or practice on the part of QCC.

First, Mr. Weaver claims that QCC had a policy of delaying MRIs and surgeries "on purpose to avoid the use of the $100,000 pooled funds...." [Filing No. 72-2 at 3.] But Mr. Weaver's only "evidence" of that is his citation to the Agreement, which provides that:

When off-site care, including hospital care, ambulance services are required for a covered person – in the opinion of the treating physician and/or QCC's Medical Director, QCC shall arrange for said care and be financially responsible for the cost of all approved medical care and/or diagnostic testing, up to the maximum dollars pool agreed ($100,000 annually).

      *      *      *

QCC shall manage all inmate healthcare costs for off-site services up to an annual pool limit of $100,000. If medical, services exceed the total of the annual pool, all excess invoices shall be returned to the COUNTY for payment....

[Filing No. 71-1 at 2 (emphasis omitted); Filing No. 71-1 at 7 (emphasis omitted).] This evidence simply shows that there was a pool of $100,000 that the Jail could use to pay for off-site medical care for inmates, and that QCC managed those off-site healthcare costs. It does not show that there was a policy of delaying off-site treatment so as not to dip into the $100,000 pool.

Second, Mr. Weaver argues that QCC had a policy of ignoring requests for outside medical services and delaying or refusing treatment. Mr. Weaver does not cite to record evidence in his supporting brief to support this contention, but the Court assumes he is relying on his own Declaration in which he states that another inmate had an ear infection and the medical staff would not refer him to a doctor, and that another inmate broke his collar bone and did not see a doctor for two weeks. This evidence is not sufficient to show a policy of ignoring requests for outside treatment or delaying such treatment.[4] *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) ("a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature"). Further, Mr. Weaver's statement that an inmate broke his hand and had surgery the same week would contradict any such policy.

In short, Mr. Weaver has not provided admissible evidence from which a reasonable jury could conclude that a widespread policy or practice of QCC's caused the alleged constitutional violations. The Court **GRANTS** QCC's Motion for Summary Judgment on Mr. Weaver's Eighth Amendment and § 1983 claims.

c. Policy or Practice of the Jail

As for the Jail, Mr. Weaver argues in his response brief that it had the same policies as QCC – denying outside medical services to avoid using the $100,000 pooled funds, and ignoring requests for outside medical services and delaying or refusing treatment – and that it also had a policy of treating in-county inmates more rapidly than out-of-county inmates. Again, Mr. Weaver

---

[4] The Court also agrees with QCC that an inmate with an ear infection would not necessarily require referral to an off-site doctor, and it is not clear whether Mr. Weaver is stating that the inmate who broke his collar bone did not see an off-site doctor or a QCC doctor for two weeks.

does not present any evidence indicating a widespread policy or practice that caused his constitutional violation. The evidence he does submit does not establish the existence of the first two policies or practices for the same reasons as discussed above in connection with QCC. And, if anything, the evidence indicates that the Jail did not have those policies or practices. For example, Mr. Weaver argues that the Jail had a policy or practice of delaying or refusing medical treatment, but the evidence shows that Mr. Weaver received prompt responses to all of his medical requests – just not the responses he wanted.[5]

Mr. Weaver also contends that the Jail had a policy of treating in-county inmates more rapidly than out-of-county inmates. The only evidence that could support this contention is Mr. Weaver's statement in his Declaration that the Jail Commander told him that one in-county inmate broke his hand and had surgery the same week, that another in-county inmate got prescriptions he needed, and that "since I was an out-of-county inmate they didn't know I was being treated differently." [Filing No. 72-1 at 7.] Similar to Mr. Weaver's statement regarding a delay in off-site medical treatment, the Court finds this evidence insufficient to establish a policy of treating

---

[5] Mr. Weaver relies heavily on *Awalt v. Marketti*, 75 F.Supp.3d 777 (N.D. Ill. 2014), but refers to the case as "*Await*," characterizes the case as one from the Southern District of Indiana, and also refers to "Judge Tinder" in setting forth *Awalt*'s holding. Judge Thomas Durkin of the Northern District of Illinois was the District Judge that decided *Awalt*, not Judge Tinder, who was serving as a Judge on the United States Court of Appeals for the Seventh Circuit in 2014. In any event, *Awalt* is inapposite. On the policy or practice issue, Mr. Weaver argues that *Awalt* stands for the proposition that "the policy of passing requests to the medical personnel creates a question of fact as to whether a de facto policy was created for the jail," and that "the routine failure to respond to…grievances or requests created a substantial risk of injury to inmates." [Filing No. 72-2 at 4-5.] The Superintendent of the Jail in *Awalt* testified that he passed medical grievances on to the medical staff, and the court found that this created a question of fact as to whether the Superintendent had created a de facto grievance policy for the jail. Here, the medical records indicate that Mr. Weaver's requests were submitted electronically, through the Jail's electronic grievance system, and that Mr. Weaver received responses to all of his requests. [Filing No. 72-1 at 1; *see, e.g.*, Filing No. 72-1 at 13.] *Awalt* is inapplicable to the facts of this case on the policy or practice issue.

in-county inmates more favorably than out-of-county inmates. The Jail Commander's reference to two in-county inmates who received care different from the care Mr. Weaver requested, for conditions different than Mr. Weaver's, does not show the "series of violations [that] must be presented to lay the premise" that there was a widespread policy or practice that caused Mr. Weaver's alleged constitutional deprivations. *Palmer*, 327 F.3d at 596.

Mr. Weaver has failed to present evidence that the Jail had a widespread policy or practice that caused the alleged constitutional violations and, accordingly, the Court **GRANTS** Sheriff Morris's Motion for Summary Judgment on Mr. Weaver's Eighth Amendment and § 1983 claims.[6]

### B. Negligence Claim

Mr. Weaver also asserts a negligence claim against QCC, and the Court must determine whether it is appropriate to exercise supplemental jurisdiction over that claim pursuant to 28 U.S.C. § 1367. The Court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction…."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

---

[6] Because the Court finds that Mr. Weaver has not shown that a policy or practice of Defendants caused the alleged constitutional violations, it need not and will not consider whether Defendants were deliberately indifferent to Mr. Weaver's serious medical need.

The Seventh Circuit has made clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits") (citation and quotation marks omitted). Exceptions to the general rule exist "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) [when] substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (internal quotation marks omitted)).

The relevant factors weigh in favor of the Court following the "usual practice" and relinquishing supplemental jurisdiction over Mr. Weaver's negligence claim against QCC. *Groce*, 193 F.3d at 501. Both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). Further, there is no indication that the Court or the parties have expended significant resources on this claim. Additionally, it is not clear from the current record how this claim should be decided. Accordingly, the Court exercises its discretion to relinquish supplemental jurisdiction over Mr. Weaver's negligence claim against QCC.

## IV.
### CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS IN PART** QCC's Motion for Summary Judgment, [67], to the extent it relates to Mr. Weaver's Eighth Amendment and § 1983 claims;

- **GRANTS** Sheriff Morris's Motion for Summary Judgment, [70]; and

- **DISMISSES WITHOUT PREJUDICE** Mr. Weaver's negligence claim against QCC.

Final judgment shall enter accordingly.

Date: 9/13/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record**